PAUL F. SHOEN; ALAN KAHN; AND GLENBROOK CAPITAL LIMITED PARTNERSHIP, APPELLANTS, v. SAC HOLDING CORPORATION, A NEVADA CORPORATION; SAC HOLDING CORPORATION II, A NEVADA CORPORATION; THREE SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; FOUR SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; FIVE SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; SIX SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; SIX-A SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; SIX-B SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; SIX-C SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; SEVEN SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; EIGHT SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; NINE SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; TEN SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; ELEVEN SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; TWELVE SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; THIRTEEN SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; FOURTEEN SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; FIFTEEN SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; SIXTEEN SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; SEVENTEEN SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; EIGHTEEN SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; NINETEEN SAC SELF-STORAGE LIMITED PARTNERSHIP, A NEVADA LIMITED PARTNERSHIP; TWENTY SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; TWENTY-ONE SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; TWENTY-TWO SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; TWENTY-THREE SAC SELF-STORAGE CORPORATION, A NEVADA CORPORATION; TWENTY-FOUR SAC SELF-STORAGE LIMITED PARTNERSHIP, A NEVADA LIMITED

PARTNERSHIP; TWENTY-FIVE SAC SELF-STORAGE LIMITED PARTNERSHIP, A NEVADA LIMITED PARTNERSHIP; TWENTY-SIX SAC SELF-STORAGE LIMITED PARTNERSHIP, A NEVADA LIMITED PARTNERSHIP; TWENTY-SEVEN SAC SELF-STORAGE LIMITED PARTNERSHIP, A NEVADA LIMITED PARTNERSHIP; EDWARD J. SHOEN, AN INDIVIDUAL; MARK V. SHOEN, AN INDIVIDUAL; JAMES P. SHOEN, AN INDIVIDUAL; JOHN M. DODDS, AN INDIVIDUAL; WILLIAM E. CARTY, AN INDIVIDUAL; RICHARD HERRERA, AN INDIVIDUAL; AUBREY JOHNSON, AN INDIVIDUAL; CHARLES J. BAYER, AN INDIVIDUAL; JOHN P. BROGAN, AN INDIVIDUAL; JAMES J. GROGAN, AN INDIVIDUAL; AND AMERCO, A NEVADA CORPORATION, RESPONDENTS.

RON BELEC, APPELLANT, v. AMERCO, A NEVADA CORPORATION; EDWARD J. SHOEN, AN INDIVIDUAL; MARK V. SHOEN, AN INDIVIDUAL; JAMES P. SHOEN, AN INDIVIDUAL; JOHN M. DODDS, AN INDIVIDUAL; WILLIAM E. CARTY, AN INDIVIDUAL; CHARLES J. BAYER, AN INDIVIDUAL; JOHN P. BROGAN, AN INDIVIDUAL; AND JAMES J. GROGAN, AN INDIVIDUAL, RESPONDENTS.

No. 41563

July 13, 2006

137 P.3d 1171

*Beckley Singleton, Chtd.*, and *Daniel F. Polsenberg*, Las Vegas; *Berman Devalerio Pease Tabacco Burt & Pucillo* and *Christopher T. Heffelfinger*, San Francisco, California; *Harold B. Obstfeld*,

New York, New York; *Robbins Umeda & Fink* and *Brian Robbins*, San Diego, California, for Appellants Belec, Glenbrook Capital and Kahn.

*Lewis & Roca* and *Martha J. Ashcraft* and *James E. Berchtold*, Las Vegas; *Latham & Watkins* and *Brian T. Glennon* and *Marc W. Rappel*, Los Angeles, California, for Appellant Paul Shoen.

*Calvin R.X. Dunlap and Associates* and *Calvin R.X. Dunlap*, Reno; *Squire, Sanders & Dempsey, L.L.P.*, and *Brian A. Cabianca* and *Mark A. Nadeau*, Phoenix, Arizona, for Respondents SAC Entities and Mark Shoen.

*Laxalt & Nomura, Ltd.*, and *Daniel T. Hayward* and *Kerry Zachariasen Malone*, Reno; *Morrison & Foerster, LLP*, and *Melvin R. Goldman* and *Jack W. Londen*, San Francisco, California, and *Mark R. McDonald*, Los Angeles, California, for Respondent AMERCO.

*Parsons Behle & Latimer* and *John P. Fowler* and *Rew R. Goodenow*, Reno; *Irell & Manella, LLP*, and *Charles Edward Elder*, *Daniel Patrick Lefler* and *David Siegel*, Los Angeles, California, for Respondents Bayer, Brogan, Dodds, Grogan, Herrera, and Johnson.

*McDonald Carano Wilson LLP* and *Pat Lundvall* and *Thomas R.C. Wilson II*, Reno; *Pillsbury Winthrop Shaw Pittman LLP* and *Theodore Keith Bell* and *Walter J. Robinson*, Palo Alto, California, for Respondents Edward J. Shoen, James P. Shoen and William E. Carty.

# OPINION

By the Court, HARDESTY, J.:

In resolving this appeal, we clarify when the demand for corrective action that a shareholder must make upon a company's board of directors before filing a derivative suit may be excused as futile. Appellants Paul Shoen, Ron Belec, Glenbrook Capital, L.P., and Alan Kahn are shareholders in AMERCO, a Nevada holding company whose main subsidiary is U-Haul International, Inc. In 2002 and 2003, appellants filed four separate derivative suits, on behalf of nominal respondent AMERCO, against respondents who are (1) then-current and former AMERCO directors; (2) self-storage corporations or partnerships, known as the SAC entities; and (3) the SAC entities' sole shareholder, Mark Shoen.[1] All four suits were essentially based on allegations of improper and unfair dealings and transactions between AMERCO and the SAC entities, to the detriment of AMERCO's shareholders.

Appellants made no demand on the AMERCO directors for corrective action before filing their complaints. The district court dismissed appellants' amended and proposed consolidated complaints, finding that they did not sufficiently allege that such a demand would be futile.

We conclude that, when a shareholder's demand would be made to the same board that voted to take (or reject) an action, so that the allegedly improper action constitutes a business decision by the board, a shareholder asserting demand futility must allege, with particularity, facts that raise a reasonable doubt as to the directors' independence or their entitlement to protection under the business

---

[1]Another similar derivative suit was filed by M.S. Management, Inc., which also participated in the district court proceedings. Since M.S. Management subsequently formally withdrew as a plaintiff, that company is not participating in this appeal and is not further referenced in this opinion.

judgment rule. However, when a board does not affirmatively make a business decision or agree to the subject action, the demand requirement will be excused as futile only when particularized pleadings show that at least fifty percent of the directors considering the demand for corrective action would be unable to act impartially.

Because we now clarify the test for determining whether a complaint sufficiently alleges demand futility, we reverse the district court's order dismissing the shareholders' complaints, amended complaint, and proposed consolidated complaint for failure to make a demand or to sufficiently allege demand futility, and we remand this matter for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

Incorporated in Nevada in 1969, AMERCO operates as the holding company for business dealings that involve U-Haul International, Inc. U-Haul was founded by Leonard Samuel Shoen in 1945, and its business concerns include wholly owned U-Haul centers and a network of independent dealers that sell moving products and rent trucks, trailers, and self-storage units to "do-it-yourself" movers. In addition to its U-Haul concerns, AMERCO acquires and develops real property for self-storage facilities through a subsidiary called AMERCO Real Estate Corporation (AREC). Ultimately, Leonard transferred most of his AMERCO stock to his thirteen children, including sons Paul, Edward J. (Joe), James, and Mark, which led, in the 1980s, to an unfortunate and well-documented family feud between shifting factions for corporate control.

The derivative suits allege that, in addition to owning AMERCO stock, each of the four sons is or has at relevant times served as an AMERCO director and/or officer. Joe and James have served on AMERCO's board of directors since 1986. Mark served as a director between 1990 and 1997 and is also employed as an AMERCO executive officer. While Paul no longer participates as an AMERCO officer or director, he served on the board of directors for several years before 1991, and from 1997 to 1998.

In the 1990s, Joe, James, and Mark formed SAC Holding Corporation and various SAC Self-Storage Corporations and partnerships to operate as real estate holding companies (the SAC entities). In 1994, however, before filing for personal bankruptcy, Joe and James[2] transferred their shares in the SAC entities to Mark.

---

[2] A 1994 lawsuit in Arizona, arising out of the corporate in-fighting, resulted in a jury award of $461 million in compensatory damages against Joe and James and $7 million in punitive damages against Joe. As a result, Joe and James filed for bankruptcy.

Ever since that time, Mark has been the SAC entities' sole shareholder.

According to appellants, Joe, James, and Mark have formed an "insider group." Through board domination, appellants claim, the "insider group" brothers have engaged in acts to further their own interests, to the detriment of AMERCO shareholders, by building a competing business in the SAC entities. This operation was accomplished, they assert, through the transfer of AMERCO's self-storage business and assets to the SAC entities at unfair terms.

Consequently, appellants filed derivative suits seeking, among other things, to "halt and unwind" the AMERCO-SAC entities transactions. But none of the appellants made any pre-suit demand on the AMERCO board of directors or the other shareholders to obtain the corrective action. Instead, appellants alleged in their complaints that any such demand would be futile, in large part because several board members, while not voting for the challenged transactions, participated in the wrongdoing and because the board is dominated and controlled by the interested "insider group"—and in particular, by Joe.

*District court proceedings*

After Paul and another shareholder, Ron Belec, filed their individual derivative actions, respondents moved to dismiss the two actions for failure to make the required pre-suit demands or to allege with particularity why it would have been futile to do so. Although the district court denied the motions, the court indicated that demand futility had not been shown and granted both Paul and Belec leave to amend their complaints.

Paul, but not Belec, then filed an amended complaint, and respondents again asked the court to dismiss Paul's action. Specifically, respondents contended that Paul had again failed to satisfactorily plead demand futility and that he had also failed to state a claim upon which relief could be granted and to file his complaint before the applicable time limits had run.

Thereafter, the district court sua sponte consolidated Paul's and Belec's suits. In its consolidation order, the court noted that it could not merge the complaints or claims for relief, and it thus granted the parties leave to amend the caption of one of the complaints to include all of the parties, on condition that the other two cases then be voluntarily dismissed. Neither Paul nor Belec amended any caption or voluntarily dismissed any action. After Paul's and Belec's actions were consolidated, shareholders Glenbrook Capital, L.P., and Alan Kahn filed their individual derivative complaints.

Later, the district court issued a notice directing Paul and Belec to appear at a May 6, 2003, hearing, regarding "issues concerning dismissal, as well as other issues that would benefit from an

early disposition." In particular, the court noted that motions to dismiss were pending in Paul's action and that "similar dismissal issues" existed in Belec's case. Consequently, Paul and Belec were formally notified of the hearing on the motions to dismiss, but Glenbrook Capital and Kahn were not.

One day before the hearing, on May 5, 2003, Paul, Belec, Glenbrook Capital, and Kahn stipulated to consolidate their cases, appoint Paul's and Belec's attorneys as lead co-counsel, and file a superseding consolidated complaint, to which respondents would then have thirty days to file answers or motions to dismiss. Apparently, however, this stipulation was not filed with the court until after the May 6 hearing. Also on May 5, 2003, although the court had not yet approved of the stipulation, Paul's counsel filed a notice of intent to submit, if permitted, a consolidated complaint, attaching to the notice a proposed consolidated complaint.

### The proposed consolidated complaint

The proposed consolidated complaint asserts eight causes of action, involving alleged breaches of fiduciary duties and violations of corporate and tort laws. In that complaint, appellants assert that, before the SAC entities were formed, AMERCO aggressively pursued opportunities to add self-storage facilities to its portfolio. Since then, however, they claim, those efforts have been refocused to benefit Mark and the SAC entities, rather than AMERCO.

In particular, the proposed consolidated complaint asserts that Mark and the SAC entities have improperly profited in the following three ways. First, appellants allege that AMERCO's public filings show that AMERCO or its subsidiaries sold self-storage properties to the SAC entities at "acquisition cost plus capitalized expenses," or at prices ultimately determined by Joe. The prices were allegedly unfairly low because they did not include added value resulting from AMERCO having leased the property, goodwill associated with use of the U-Haul name, and the properties' locations near U-Haul centers where customers can obtain and return moving vehicles.

Second, appellants allege that AMERCO financed the self-storage property transactions by giving the SAC entities over $400 million in nonrecourse loans. As a result, AMERCO was left with the financial risk, while the SAC entities reaped appreciation, tax benefits, and net cash flow.

For instance, appellants assert that, in 1995, when AMERCO needed capital itself, it loaned the SAC entities $54,671,000 to purchase forty-four self-storage properties, twenty-four of which were purchased from AMERCO or AREC at the profitless price of $26,287,000. Allegedly, as the SAC entities continued to construct and purchase (from AMERCO and others) self-storage properties in direct competition with U-Haul, and as AMERCO's finan-

cial position deteriorated, comparable loans-for-purchases (or loans-for-construction) transactions occurred in 1995 and 1996, and in the years from 1998 to 2001, each of which are similarly detailed in the complaint.

Once the SAC entities obtained the properties, they assertedly entered into agreements with U-Haul, under which U-Haul manages the properties in the U-Haul name. The proposed complaint maintains that the management agreements are actually "triple-net leases" and that U-Haul's management fee is subordinate to payments owed to the properties' primary lenders.

And third, the proposed complaint alleges that the SAC entities profited from the use of AREC's employee resources to locate, purchase, develop, and lease self-storage facilities, without, "on information and belief," justly compensating AREC or AMERCO.

According to the proposed complaint, none of the AMERCO-SAC entities transactions, or the use of AREC employees, was presented to or ever approved by AMERCO's board of directors. And, allegedly, none of AMERCO's financial statements fully explained the SAC entities' involvement with AMERCO. Consequently, the proposed complaint alleges, the board respondents knowingly signed false, incomplete and misleading public disclosure statements. As support for this proposition, the proposed complaint notes that AMERCO's external auditor later required disclosure of AMERCO's relationship with the SAC entities, which resulted in negative financial showings, plummeting stock prices, and the firing of the external auditor. And, the proposed complaint asserts, in 2002, the SAC entities began to "move into" U-Haul's core business—moving vehicle rentals—by acting as independent dealers at 276 locations.

With regard to the allegations against former and current members of AMERCO's eight-member board of directors, the proposed consolidated complaint asserts that they breached their fiduciary duties of loyalty and care by "authorizing or permitting the authorization of, or failing to monitor, the practices and conduct which resulted in [the acts complained of]." The directors "and/or" officers were allegedly involved in the "planning and creating (or causing to be planned and created)[,] proposing (or causing the proposal of)[,] and authorizing, approving and acquiescing in the illegal conduct complained of herein." The proposed complaint asserts that each of the respondent directors,[3] through his position on an AMERCO committee and/or as a director or officer of the AMERCO subsidiary that was involved in the wrongful acts, "had knowledge of and actively participated in and approved

---

[3]M. Frank Lyons is a member of AMERCO's board of directors. While he was named as a party in Belec's complaint, he was not named as a party in Paul's complaint, his amended complaint or the proposed consolidated complaint.

of the wrongdoings alleged or abdicated his responsibilities with respect to these wrongdoings.'' Appellants assert that efforts to conceal AMERCO's true financial status—by the former board's intentional signing of the ''false and misleading'' public financial statements and the current board's failure to clarify those statements—amount to conspiracy to defraud.

The proposed consolidated complaint was never filed.

### District court hearing

At the May 6 hearing, the court indicated that it wished to address the motions to dismiss Paul's amended complaint. Appellants then raised the consolidation issue and questioned whether they would be permitted to file the proposed consolidated complaint. They noted that, if the court accepted their proposal to file a consolidated complaint, the motions to dismiss would become moot. It was pointed out that Belec had not filed a separate amended complaint, and counsel for Glenbrook Capital and Kahn, who were also present at the hearing, reminded the court that, while those appellants were part of the proposed consolidated complaint, they were not part of the discussion relating to the motions to dismiss, since no motions had been filed against them.

The district court responded by indicating that the parties should proceed to address the dismissal motions. Paul's counsel advised that he could only speak on behalf of Paul and his amended complaint, and the court agreed. But in addressing the motions to dismiss Paul's amended complaint for failure to sufficiently allege demand futility, Paul's counsel indicated that the ''demand futility section[s]'' of his amended complaint and the proposed consolidated complaint were ''the same.'' Apparently as a result, the argument on the motions to dismiss was thereafter based solely on the proposed consolidated complaint, even though it had not yet been filed.

Ultimately, the district court determined that neither the amended complaint nor the proposed consolidated complaint sufficiently alleged demand futility.[4] Consequently, the court dismissed all four suits—including Paul's and Belec's, Glenbrook Capital's, and Kahn's suits—without leave to amend. This appeal followed.[5]

---

[4]Although the district court initially dismissed the underlying suits based on the court's determination that fraudulent misrepresentation had not been particularly pleaded, the court later amended its initial dismissal order to reflect, without analysis, its ultimate conclusion that dismissal was warranted because appellants had failed to allege demand futility with particularity.

[5]Even though the proposed consolidated complaint had not been previously filed, the court and the parties addressed the dismissal motions in light of that complaint. In dismissing both the amended and proposed consolidated complaints, the court effectively recognized that, since Paul's counsel had con-

## DISCUSSION

Ordinarily, under Nevada's corporations laws, a corporation's "board of directors has full control over the affairs of the corporation."[6] The board's power to act on the corporation's behalf is governed by the directors' fiduciary relationship with the corporation and its shareholders,[7] which imparts upon the directors duties of care and loyalty.[8] In essence, the duty of care consists of an obligation to act on an informed basis; the duty of loyalty requires the board and its directors to maintain, in good faith, the corporation's and its shareholders' best interests over anyone else's interests.[9]

Balancing these duties, however, is the protection generally afforded directors in conducting the corporation's affairs by the business judgment rule. The business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[10] In 1991, the Nevada Legislature codified the business judgment rule at NRS 78.138.[11]

In managing the corporation's affairs, the board of directors may generally decide whether to take legal action on the corporation's behalf.[12] Nonetheless, when the board fails to appropriately

---

ceded that the demand futility analysis was identical under both complaints, if demand futility had not been sufficiently alleged, there was no reason to approve the filing of the proposed consolidated complaint. Thus, while the parties and, therefore, this court have addressed the motions to dismiss only with respect to the proposed consolidated complaint on appeal, we note that, as lead co-counsel indicated, the demand futility analysis applies equally to Paul's amended complaint.

[6]NRS 78.120(1); *see Berman v. Riverside Casino Corporation*, 247 F. Supp. 243, 245 (D. Nev. 1964).

[7]*Foster v. Arata*, 74 Nev. 143, 155, 325 P.2d 759, 765 (1958); *see also Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360-61, 367 (Del. 1993).

[8]*See Cede & Co.*, 634 A.2d at 360-61; *see also Horwitz v. Southwest Forest Industries, Inc.*, 604 F. Supp. 1130, 1134 (D. Nev. 1985).

[9]*Cede & Co.*, 634 A.2d at 361, 367; *see also Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Horwitz*, 604 F. Supp. at 1134.

[10]*Aronson*, 473 A.2d at 812.

[11]1991 Nev. Stat., ch. 442, § 2, at 1184; NRS 78.138(3) ("Directors and officers, in deciding upon matters of business, are presumed to act in good faith, on an informed basis and with a view to the interests of the corporation.").

[12]*Aronson*, 473 A.2d at 811, 813; *see also Cottle v. Hilton Hotels Corp.*, 635 F. Supp. 1094, 1097 (N.D. Ill. 1986).

act, individual shareholders may file a suit in equity to enforce the corporation's rights. Thus, so-called derivative suits allow shareholders to "compel the corporation to sue" and to thereby pursue litigation on the corporation's behalf against the corporation's board of directors and officers, in addition to third parties.[13] But because the power to manage the corporation's affairs resides in the board of directors, a shareholder must, before filing suit, make a demand on the board, or if necessary, on the other shareholders, to obtain the action that the shareholder desires.[14]

This demand requirement recognizes the corporate form in two ways. First, a demand informs the directors of the complaining shareholder's concerns and gives them an opportunity to control any acts needed to correct improper conduct or actions, including any necessary litigation.[15] The demand requirement also acknowledges that "the acts in question may be subject to ratification by a majority of the shareholders, thus precluding the necessity of suit."[16] Second, the demand requirement protects clearly discretionary directorial conduct and corporate assets by discouraging unnecessary, unfounded, or improper shareholder actions.[17] Thus, in "promoting . . . alternate dispute resolution, rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations."[18]

*Pleading demand satisfaction or futility*

In light of the demand requirement, NRCP 23.1 imposes heightened pleading imperatives in shareholder derivative suits.[19] Under this rule, a derivative complaint must state, with particularity, the demand for corrective action that the shareholder made on the

---

[13]*Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 95-96 (1991); *see also Cohen v. Mirage Resorts, Inc.*, 119 Nev. 1, 19, 62 P.3d 720, 732 (2003).

[14]NRS 41.520(2) ("The complaint must also set forth with particularity the efforts of the plaintiff to secure from the board of directors or trustees and, if necessary, from the shareholders such action as he desires, and the reasons for his failure to obtain such action or the reasons for not making such effort."); *see also* NRCP 23.1 (governing the procedure for filing shareholder derivative suits).

[15]*See Aronson*, 473 A.2d at 812; *see also Brehm*, 746 A.2d at 255; *Marx v. Akers*, 666 N.E.2d 1034, 1037 (N.Y. 1996).

[16]*Wolgin v. Simon*, 722 F.2d 389, 392 (8th Cir. 1983) (citations omitted).

[17]*Aronson*, 473 A.2d at 812; *Brehm*, 746 A.2d at 255; *Marx*, 666 N.E.2d at 1037.

[18]*Aronson*, 473 A.2d at 812.

[19]*See also* NRS 41.520(2).

board of directors (and, possibly, other shareholders) and why he failed to obtain such action, or his reasons for not making a demand.[20] Thus, as the Delaware Supreme Court has recognized in a similar shareholder demand context, a shareholder must "set forth . . . particularized factual statements that are essential to the claim" that a demand has been made and refused, or that making a demand would be futile or otherwise inappropriate.[21] We note, however, that NRCP 8(e) requires pleadings to be "simple, concise, and direct." Accordingly, "the pleader is not required to plead evidence."[22] Nonetheless, mere conclusory assertions will not suffice under NRCP 23.1's "with particularity" standard.[23]

A shareholder's failure to sufficiently plead compliance with the demand requirement deprives the shareholder of standing[24] and justifies dismissal of the complaint for failure to state a claim upon which relief may be granted.[25] Since dismissing a shareholder derivative suit for failure to sufficiently plead the demand requirement is akin to dismissing a complaint for failure to state a claim upon which relief can be granted,[26] such dismissal orders are subject to similar de novo standards of review. Accordingly, the district court's decision to grant an NRCP 23.1 motion to dismiss is rig-

---

[20]NRCP 23.1 provides, in pertinent part, that "[t]he complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort."

[21]*Brehm*, 746 A.2d at 254 (noting that the "with particularity" pleading required in shareholder derivative suits in Delaware is similar to the heightened pleading required for claims involving fraud or mistake); *cf.* NRCP 9 (providing that claims for fraud or mistake must be pleaded with particularity).

[22]*Brehm*, 746 A.2d at 254.

[23]*Id.*

[24]*Nelson v. Anderson*, 84 Cal. Rptr. 2d 753, 763 (Ct. App. 1999); *see also* 19 Am. Jur. 2d *Corporations* § 1961 (2004) (discussing demand requirement as a matter of standing).

[25]*See Allen ex rel. Allen & Brock v. Ferrera*, 540 S.E.2d 761, 764 (N.C. Ct. App. 2000).

[26]*Brehm*, 746 A.2d at 254 (overruling *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), to the extent that *Aronson* suggests that an abuse of discretion standard should be applied when reviewing orders dismissing derivative suits for insufficient pleading). While the NRCP 23.1 and NRCP 12(b)(5) standards are similar, we nevertheless note that the NRCP 23.1 standard is more rigorous than the standard governing NRCP 12(b)(5), and therefore, a complaint that meets the NRCP 23.1 standard and otherwise states a claim generally also will suffice under the NRCP 12(b)(5) standard. *See Solomon v. Pathe Communications Corp.*, 672 A.2d 35, 39 (Del. 1996).

orously reviewed.[27] This court, like the district court, must accept as true each of the complaint's particularized factual allegations and draw every fair factual inference flowing from those particularly alleged facts in favor of the nonmoving party.[28]

### Demand futility

In *Johnson v. Steel, Incorporated*, a 1984 case, this court stated that "[w]here the board participated in the wrongful act or is controlled by the principal wrongdoer, it is generally held that no demand is needed."[29] For instance, there is no point in requiring a party to make a demand for corrective action to officers and directors who are swayed by outside interests, which contaminates their ability to conduct the corporation's affairs.[30]

However, the directive previously articulated in *Johnson* is insufficient. The *Johnson* directive, broadly interpreted, suggests that the demand prerequisite could be excused with a mere allegation of participation. Such a broad reading could subject the board to immediate litigation, and thereby eviscerate the purpose behind the demand requirement and the business judgment rule.[31] We agree with the Delaware Supreme Court's observation in *Aronson v. Lewis* that "[b]earing in mind the presumptions with which director action is cloaked, . . . the matter must be approached in a more balanced way."[32] Accordingly, to the extent that *Johnson* suggests that the demand requirement is excused as to the board of directors merely because the shareholder derivative complaint alleges that a majority of the directors participated in wrongful acts, without regard to their impartiality or to the protections of the business judgment rule, it is overruled.

The business judgment rule, however, pertains only to directors whose conduct falls within its protections.[33] Thus, it applies only in

---

[27]*Vacation Village v. Hitachi America*, 110 Nev. 481, 484, 874 P.2d 744, 746 (1994); *Brehm*, 746 A.2d at 253-54.

[28]*Vacation Village*, 110 Nev. at 484, 874 P.2d at 746; *Brehm*, 746 A.2d at 253-54, 255. In light of this standard of review, we emphasize that, while we accept as true the complaint's allegations and draw all reasonable inferences in appellants' favor when reviewing NRCP 23.1 issues, our doing so is not a reflection on the merits of those allegations.

[29]100 Nev. 181, 184, 678 P.2d 676, 679 (1984).

[30]*Aronson*, 473 A.2d at 814.

[31]*Id.*

[32]*Id.*

[33]*Id.* at 812.

the context of valid interested director action,[34] or the valid exercise of business judgment by disinterested directors in light of their fiduciary duties.[35] But the subject of shareholder derivative complaints is not necessarily always a business decision by the directors, and the directors to whom a demand must be made are not always the same directors as those against whom the allegations are made. Thus, it is not enough to say that the court must always look to the business judgment rule in deciding whether demand futility has been sufficiently pleaded.

Facing this same quandary, the Delaware Supreme Court has developed, in a series of decisions, two associated analyses to be conducted depending on whether the board that would consider a demand is (1) potentially protected by the business judgment rule when its direct action is in question, or (2) can be disinterested and independent in its evaluation of the demand for corrective action.

### When the alleged wrongs constitute a business decision by the board of directors

In *Aronson*, a 1984 case, the Delaware Supreme Court examined whether making a demand on a board of directors was excused merely because the shareholder plaintiff alleged that the board participated in the wrongdoing and consequently was automatically considered partial or "guilty."[36] That court concluded that allegations of mere participation in the wrongdoing are insufficient to excuse the demand requirement because, in making a business decision, disinterested directors may invoke the business judgment rule's protections.[37] In other words, even a bad decision is generally protected by the business judgment rule's presumption that the directors acted in good faith, with knowledge of the pertinent information, and with an honest belief that the action would serve the corporation's interests.[38]

In explaining how the business judgment rule presumption operates, the *Aronson* court first noted that only disinterested directors can claim its protections.[39] Then, if that threshold is met, the business judgment rule presumes that the directors have complied with their duties to reasonably inform themselves of all relevant, material information and have acted with the requisite care in making the business decision.[40] Consequently, a plaintiff challenging a

---

[34]*Id.*; NRS 78.140 (governing interested director transactions).

[35]*Aronson*, 473 A.2d at 812; NRS 78.138(3).

[36]*Aronson*, 473 A.2d at 814.

[37]*Id.*

[38]NRS 78.138(3).

[39]*Aronson*, 473 A.2d at 812.

[40]*Id.*

business decision and asserting demand futility must sufficiently show that either the board is incapable of invoking the business judgment rule's protections (*e.g.*, because the directors are financially or otherwise interested in the challenged transaction) or, if the board is capable of invoking the business judgment rule's protections, that that rule is not likely to in fact protect the decision (*i.e.*, because there exists a possibility of overcoming the business judgment rule's presumptions that the requisite due care was taken when the business decision was made).[41] Of course, since approval of a transaction by the majority of a disinterested and independent board usually "bolsters" the presumption that the transaction was carried out with the requisite due care, "[i]n such cases, a heavy burden falls on a plaintiff to avoid presuit demand."[42]

The *Aronson* court accordingly concluded that a two-pronged demand futility analysis applies to determine if a complaint has created a reasonable doubt as to whether the directors, having made a business decision, were disinterested and independent, or likely entitled to the business judgment rule's protection:

> [I]n determining demand futility[,] the [trial court] . . . must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.[43]

---

[41]*Id.* at 814; *see also Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988).

[42]*Grobow*, 539 A.2d at 190; *see also Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993) (recognizing that demand futility analyses are "designed, in part, . . . [to require] derivative plaintiffs to make a threshold showing, through the allegation of particularized facts, that their claims have some merit").

[43]*Aronson*, 473 A.2d at 812. Although the two-pronged *Aronson* analysis was originally articulated in the conjunctive, *see id.*, the Delaware Supreme Court, in quoting this analysis in a 1993 case, replaced that conjunctive with the disjunctive "or." *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993). While the *Rales* decision did not explain why the court had replaced the "and" with an "or," the *Rales* court's doing so appears consistent with the Delaware Supreme Court's previous interpretations of the *Aronson* test, and the *Aronson* explanation of the test, as further discussed above. *See Pogostin v. Rice*, 480 A.2d 619, 624-25 (Del. 1984) (noting that, "[i]f the [trial court] in the exercise of its sound discretion is satisfied that a plaintiff has alleged facts with particularity which, taken as true, support a reasonable doubt as to *either aspect* of the *Aronson* analysis, the futility of demand is established and the court's inquiry ends"), *overruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988) (recognizing that inquiry into a director's self-dealing was a threshold requirement); *Levine v. Smith*, 591 A.2d 194, 206 (Del. 1991) ("The point is that in a claim of demand futility, there are two alternative hurdles, either of which a derivative shareholder complainant must overcome to successfully withstand a Rule 23.1 motion.").

Under the *Aronson* test's first prong, the demand requirement is excused without further inquiry if the complaint's allegations, taken as true and with all fair inferences drawn in favor of the plaintiff, show that the protection afforded by "the business judgment rule is inapplicable to the board majority approving the transaction" because those directors are interested, or are controlled by another who is interested, in the subject transaction (that has not been otherwise approved by the shareholders).[44] For example, a director who has divided loyalties in relation to, or who has or is entitled to receive specific financial benefit from, the subject transaction, is an interested director.[45] "Control" refers to "the influences upon the directors' performance of their duties generally, and more specifically in respect to the challenged transaction."[46]

The second prong of the *Aronson* test for demand futility is implicated only if the business judgment rule remains applicable because a majority of directors are disinterested or independent of one who is interested under the first prong.[47] When undertaking analysis under the second prong of the *Aronson* test to determine if the complaint's particularized facts raise a reasonable doubt as to the challenged transaction constituting a valid exercise of business judgment, "the alleged wrong is substantively reviewed against the factual background alleged in the complaint."[48]

### When the alleged wrongs do not result from a business decision by the board of directors

The *Aronson* test examines whether the board considering the demand would likely be entitled to the business judgment rule's protection with regard to the challenged act, but the business judgment rule technically applies only in the context of a board of directors' decision. However, the business judgment rule's protections would not apply, for example, when the board members who decided the challenged act have since changed or when the challenged act does not constitute a business decision by the board.

Nonetheless, the demand requirement is not automatically excused just because the business judgment rule's protections technically would not apply to a particular set of circumstances. The Delaware court, in *Rales v. Blasband*, expounded upon language in *Aronson* to develop a different demand futility analysis for when the board considering a demand is not implicated in a challenged

---

[44]*Aronson*, 473 A.2d at 814-15; *Rales*, 634 A.2d at 933 (discussing *Pogostin*, 480 A.2d at 624).

[45]*Pogostin*, 480 A.2d at 624.

[46]*Id.*

[47]*Aronson*, 473 A.2d at 814; *see also Rales*, 634 A.2d at 933.

[48]*Aronson*, 473 A.2d at 814.

business transaction.[49] In those circumstances, "the demand futility analysis considers only whether a majority of the directors had a disqualifying interest in the [demand] matter or were otherwise unable to act independently" at the time the complaint was filed.[50] Thus, while the *Rales* test for alleged wrongs that do not implicate the business judgment rule directly is similar to that of the *Aronson* test's first prong, it looks not at whether the board majority approving the alleged transaction is entitled to the business judgment rule's protection for that action, but rather at "whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations," such that it could "properly exercise[ ] its independent and disinterested business judgment in responding to a demand."[51]

Thus, as with the *Aronson* test, under the *Rales* test, directors' independence can be implicated by particularly alleging that the directors' execution of their duties is unduly influenced,[52] manifesting "a direction of corporate conduct in such a way as to comport with the wishes or interests of the [person] doing the controlling."[53] A lack of independence also can be indicated with facts that show that the majority is "beholden to" directors who would be liable[54] or for other reasons is unable to consider a demand on its merits, for directors' discretion must be free from the influence of other interested persons.[55]

And again, to show interestedness, a shareholder must allege that a majority of the board members would be "materially affected, either to [their] benefit or detriment, by a decision of the board, in a manner not shared by the corporation and the stockholders."[56] Allegations of mere threats of liability through approval

[49]*Rales*, 634 A.2d at 933-34 (pointing out three situations that most often give cause to apply the *Rales* test: (1) where the majority of the directors who made the challenged business decision have been replaced, (2) where the complaint's subject matter is not a business decision of the board, and (3) where the challenged decision was made by a different company); *see also Aronson*, 473 A.2d at 813.

[50]*In re Xcel Energy, Inc.*, 222 F.R.D. 603, 607 (D. Minn. 2004) (applying the *Rales* analysis in a corporate law demand futility analysis).

[51]*Rales*, 634 A.2d at 934.

[52]*Pogostin*, 480 A.2d at 624.

[53]*Aronson*, 473 A.2d at 816 (internal quotation marks omitted); *see also Beam ex rel. M. Stewart Living v. Stewart (Beam II)*, 845 A.2d 1040, 1056 (Del. 2004).

[54]*Rales*, 634 A.2d at 936.

[55]*Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995).

[56]*Id.* We note that, depending on the circumstances, allegations of close familial ties might suffice to show interestedness or partiality. *Compare Harbor Finance Partners v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999) ("Close familial relationships between directors can create a reasonable doubt as to im-

of the wrongdoing or other participation, however, do not show sufficient interestedness to excuse the demand requirement.[57] Instead, as the Delaware courts have indicated, interestedness because of potential liability can be shown only in those "rare case[s] . . . where defendants' actions were so egregious that a substantial likelihood of director liability exists."[58]

With regard to the duty of care, the business judgment rule does not protect the gross negligence of uninformed directors and officers.[59] And directors and officers may only be found personally liable for breaching their fiduciary duty of loyalty if that breach involves intentional misconduct, fraud, or a knowing violation of the law.[60] Accordingly, interestedness through potential liability is a difficult threshold to meet.[61]

---

partiality."), *In re Oracle Corp. Derivative Litigation*, 824 A.2d 917, 937-38 (Del. Ch. 2003), *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 979 (Del. Ch. 2003), *aff'd*, 845 A.2d at 1051, *and Grimes v. Donald*, 673 A.2d 1207, 1216 (Del. 1996) (noting that "material . . . familial interest" may be a basis for claiming demand futility), *overruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000), *with In re Walt Disney Co. Derivative Lit.*, 731 A.2d 342, 355 (Del. Ch. 1998), *rev'd in part on other grounds sub nom. Brehm v. Eisner*, 746 A.2d 244, *Danielewicz v. Arnold*, 769 A.2d 274, 289 (Md. Ct. Spec. App. 2001) (recognizing that appellant had failed to establish that demand futility merely by asserting that two board members of a three-member board of directors were related), *and Siegman v. Maloney*, 54 A. 405 (N.J. 1903) (*stating that*, alone, "[n]either the existence of blood nor of business relationship justifies a presumption of dishonesty"). Thus, generally, to show partiality based on familial relations, the particularized pleadings must demonstrate why the relationship creates a reasonable doubt as to the director's disinterestedness.

[57]*See Pogostin v. Rice*, 480 A.2d 619, 624-25 (Del. 1984), *overruled in part on other grounds by Brehm*, 746 A.2d 244.

[58]*Seminaris*, 662 A.2d at 1354 (citing *Aronson*, 473 A.2d at 815); *see also Baxter Intern., Inc. Shareholders Lit.*, 654 A.2d 1268, 1269 (Del. Ch. 1995) ("'Directors who are sued for failure to oversee subordinates have a disabling interest when 'the potential for liability is not "a mere threat" but instead may rise to "a substantial likelihood."'" (quoting *Rales*, 634 A.2d at 936)); *McCall v. Scott*, 239 F.3d 808, 824 (6th Cir. 2001) (concluding that particularized facts raised a reasonable doubt as to disinterestedness by presenting a substantial likelihood of director liability).

[59]*Aronson*, 473 A.2d at 812.

[60]NRS 78.138(7). While this section applies only to claims arising after June 15, 2001, *see* 2001 Nev. Stat., ch. 601, § 63, at 3200, respondents indicate that the AMERCO articles of incorporation include an identical limitation, as permitted under former NRS 78.037(1), and appellants *apparently do not disagree* that the limitation applies to their claims.

[61]Generally, when an interested fiduciary's transactions with the corporation are challenged, the fiduciary must show good faith and the transaction's fairness. *Cf. Foster v. Arata*, 74 Nev. 143, 155, 325 P.2d 759, 765 (1958) (recognizing an interested fiduciary's burden to prove the good faith and inherent fairness of any transactions with the corporation) (citing *Pepper v. Litton*, 308

The Delaware court's approach is a well-reasoned method for analyzing demand futility and is highly applicable in the context of Nevada's corporations law. Hence, we adopt the test described in *Aronson*, as modified by *Rales*, above. When evaluating demand futility, Nevada courts must examine whether particularized facts demonstrate: (1) in those cases in which the directors approved the challenged transactions, a reasonable doubt that the directors were disinterested or that the business judgment rule otherwise protects the challenged decisions; or (2) in those cases in which the challenged transactions did not involve board action or the board of directors has changed since the transactions, a reasonable doubt that the board can impartially consider a demand.[62]

## *Making a demand on AMERCO's board of directors*

Appellants essentially allege that the AMERCO board members knew or should have known of the challenged acts, at times through their participation therein, but nonetheless failed to prevent or remedy the wrongs. Appellants also assert that a majority of the board intentionally signed false and misleading public disclosure statements designed to conceal the substance of the transactions from the AMERCO shareholders. Since, for the most part, appellants have alleged a failure to properly supervise or a willful disregard of duties, they do not challenge any board-considered business decision. Therefore, the *Rales* test applies.[63]

---

U.S. 295, 306 (1939)); *Oberly v. Kirby*, 592 A.2d 445, 469 (Del. 1991) (noting that, when approval of an interested director transaction by an independent committee is not possible, the interested directors carry the burden of proving that transaction's entire fairness). Nonetheless, it is a derivative action shareholder asserting demand futility based on a substantial likelihood of liability who must allege particularized facts from which the substantial likelihood of liability can be inferred, even though the shareholder does not carry the burden of proving unfairness.

[62]*Rales*, 634 A.2d at 933-34. We note that in practice, the *Aronson* and *Rales* "disinterested and independent" tests often amount to the same analysis—*i.e.*, whether directorial interest in the challenged act or the outcome of any related litigation negates impartiality to consider a demand. *See, e.g., Beam II*, 845 A.2d 1040; *Kohls v. Duthie*, 791 A.2d 772, 780-81 (Del. Ch. 2000). Additionally, we point out that, on an even-numbered board, the vote of disinterested and independent directors may be blocked by one-half of the board's total members. *See Beam II*, 845 A.2d at 1046 n.8 (citing *Beneville v. York*, 769 A.2d 80, 85 n.5 (Del. Ch. 2000)). Thus, when considering whether the "majority" of an even-numbered board is incapable of impartially considering a demand under the tests for demand futility, the "majority" equals at least one-half of that board.

[63]*See McCall v. Scott*, 239 F.3d 808, 816 (6th Cir. 2001) (applying the *Rales* test to claims challenging not a "conscious Board decision to refrain from acting," but the board's failure to take action out of nonfeasance—intentional ignorance and willful blindness), *amended in part*, 250 F.3d 997 (6th Cir. 2001); *In re Xcel Energy*, 222 F.R.D. at 607 (explaining that, even when defendant

The *Rales* test inquires whether the complaint's particularized facts show that the board is incapable of impartially considering a demand—*i.e.*, that a majority of the board members are interested in the decision to act on the demand or dependent on someone who is interested in that decision. Consistent with that test, appellants contend that the proposed consolidated complaint raises a reasonable doubt that the current board of directors would be able to exercise its independent and disinterested business judgment in responding to a demand. But as the district court, which has not had the benefit of this analysis in considering these arguments,[64] is a more appropriate forum in which to resolve shareholder demand disputes in the first instance, we decline to address appellants' assertions with regard to the *Rales* test at this time. Instead, we remand to the district court so that it may address whether appellants have alleged particularized facts that satisfactorily demonstrate demand futility.[65] We now move to appellants' alternative argument—

---

directors also serve on finance and audit committees, particularized facts must "link a majority of the directors to . . . concerted board action" before the *Aronson* test becomes appropriate under allegations of misconduct in light of committee knowledge but board inaction); *Kohls v. Duthie*, 791 A.2d 772, 777, 781 (Del. Ch. 2000) (analyzing a demand futility claim under the *Rales* test rather than the *Aronson* test since the allegations indicated that, while the board's directors knew of a possible corporate opportunity and discussed taking advantage of it personally, they never met to consider it on behalf of the corporation). Although appellants also assert that respondent directors "participated" in the wrongful conduct, either as board audit committee or executive finance committee members who approved the different transactions, or acts taken as officers of the involved subsidiaries, they do not allege that a majority, or more than half, of those directors participated in any individual transaction; accordingly, the alleged "participation" does not amount to concerted board action.

[64] We note that the district court, below, recognized that Nevada decisional law concerning demand futility was not entirely applicable to the circumstances presented in the underlying cases, and therefore directed appellants to court decisions interpreting Delaware demand futility law, repeatedly asking appellants to provide specifics regarding the challenged transactions. Nevertheless, as this opinion points out, while the question in this case appears to concern the current board of directors' ability to impartially consider a demand for corrective action, their entitlement to the business judgment rule's protections with regard to the alleged improper transactions is not implicated. Accordingly, we conclude that the demand futility question should be reexamined in light of the clarification of the demand futility analysis provided above.

[65] As earlier noted, *see supra* note 3, director Lyons was not named as a defendant in appellants' proposed consolidated complaint. Nevertheless, appellants generally allege that Lyons is not a disinterested and independent board member. Further, given the Shoen brothers'—Joe's and James'—direct familial ties with Mark and appellants' allegations of a past history of the three brothers' close cooperation in business transactions, it is clear that those two directors are interested for demand futility purposes. *See supra* note 56. Accordingly, on remand, the district court should consider appellants' allegations with regard to Lyons and the remaining five board members.

that the demand requirement is excused simply because they have alleged that the AMERCO-SAC entities transactions are ultra vires acts, and thus void and not amenable to ratification.

### Ultra vires acts

As an alternate argument, appellants assert that regardless of the *Aronson* and *Rales* tests, demand is excused because their proposed consolidated complaint alleges that AMERCO's transactions with the SAC entities are ultra vires acts. Generally, a corporate act is said to be ultra vires when it goes beyond the powers allowed by state law or the articles of incorporation.[66] The concept of ultra vires acts is not especially well defined, however, particularly given the latitude allowed to chartering members in delineating corporate powers in the articles of incorporation.[67] Thus, for example, "[i]f . . . the [corporation's] act was within the corporate powers, but was performed without authority or in an unauthorized manner, the act is not ultra vires."[68]

With regard to the demand requirement, when a derivative action genuinely challenges a board's act as ultra vires, demand on the shareholders is excused because, if the allegations are accepted as true, the act is void and not subject to shareholder ratification.[69] Even in the face of potentially void acts, however, the board of directors has a duty to take corrective action, for instance, by undoing the transaction or taking other legal action. In fact, under those circumstances the reason behind making the demand is espe-

---

[66]*See, e.g., Wolgin v. Simon*, 722 F.2d 389, 393 (8th Cir. 1983); *see also Solomon v. Armstrong*, 747 A.2d 1098, 1114 & n.45 (Del. Ch. 1999) (differentiating between void and voidable corporate acts); NRS 78.135(1) ("The statement in the articles of incorporation of the objects, purposes, powers and authorized business of the corporation constitutes, as between the corporation and its directors, officers or stockholders, an authorization to the directors and a limitation upon the actual authority of the representatives of the corporation.").

[67]*See Sammis v. Stafford*, 56 Cal. Rptr. 2d 589, 593 (Ct. App. 1996); *Harbor Finance Partners v. Huizenga*, 751 A.2d 879, 895-98 (Del. Ch. 1999); *see also* NRS 78.035 (listing the items that articles of incorporation must contain, and excluding any definition of corporate purpose from that list); NRS 78.037 (governing optional provisions, including limitations of corporate powers, that may be placed in the articles of incorporation).

[68]*Sammis*, 56 Cal. Rptr. 2d at 593; *see also Solomon*, 747 A.2d at 1114 & n.45.

[69]*Wolgin*, 722 F.2d at 392-93 (recognizing that a demand on the shareholders would be futile in light of ultra vires acts because those acts cannot be ratified); *Keenan v. Eshleman*, 2 A.2d 904, 909 (Del. 1938) (providing that void acts are not subject to shareholder ratification).

cially strong, particularly where, as here, it is not alleged that the board has affirmatively voted for the alleged ultra vires acts. As set forth above, the only reason to then excuse demand would arise when, under *Aronson*, a board has acted outside of the business judgment rule's protection, or when, under *Rales*, the board would not be able to impartially consider the demand.[70]

It is not clear that the district court considered whether demand on AMERCO's board was excused on this basis, and as noted above, questions of demand futility are more appropriately resolved by the district court in the first instance. Accordingly, since the district court has not had the opportunity to examine appellants' complaint in light of the *Aronson* and *Rales* tests, we reverse the district court's order dismissing the underlying cases and remand this matter to the district court to reconsider the demand requirement in light of our adoption of those tests. Given our substantial discussion of the demand requirement in this opinion, we conclude that the parties should be afforded an opportunity to file a newly amended complaint.[71]

## CONCLUSION

Today, we clarify the pleading requirements for shareholder derivative suits pursuant to NRCP 23.1. By extending this court's holding in *Johnson* to incorporate the approaches enunciated by the Delaware Supreme Court in *Aronson* and *Rales* for determining demand futility, we conclude that when it is asserted that a demand upon the corporation's board of directors or shareholders would be futile and should be excused, the shareholder must plead, with suf-

---

[70]*Aronson*, 473 A.2d 805; *Rales*, 634 A.2d 927; *see Solomon*, 747 A.2d at 1114 & n.45 (discussing, generally, the demand requirement in the context of ultra vires acts); *Huizenga*, 751 A.2d at 898 n.71 (recognizing that the business judgment rule might apply to acts that, in the broader sense of "ultra vires," fall outside the corporation's stated purpose, while recognizing that the business judgment rule might not apply to ultra vires acts that constitute " 'significant and harmful departures from the corporation's stated purposes' " (quoting J.D. Cox, T.L. Hazen, and F.H. O'Neal, 1 *Corporations* § 4.7, at 4.17 (1999), and citing H. Hovenkamp, *Enterprise and American Law*, 1836-1937, 59-63 (1991))).

[71]Belec, Glenbrook Capital, and Kahn have also argued that their due process rights were violated when the district court dismissed their suits without prior notice and a meaningful opportunity to respond. In light of our conclusion that the district court's dismissal order should be reversed and the matter remanded for further proceedings, we do not address these appellants' arguments except to note that because no motion to dismiss had been filed and no notice of any potential dismissal proceedings had been given in Glenbrook Capital's and Kahn's cases, the district court violated those parties' procedural due process right. *See Mullane v. Central Hanover Tr.*, 339 U.S. 306, 314 (1950); *see also Grannis v. Ordean*, 234 U.S. 385, 394 (1914) ("The fundamental requisite of due process of law is the opportunity to be heard.").

ficient particularity, that a reasonable doubt exists that the directors are independent and disinterested or entitled to the protections of the business judgment rule. However, where the contested corporate transaction is not the result of director action, the demand futility analysis is limited to whether a majority of the directors had a disqualifying interest in the matter or were otherwise unable to act on the demand with impartiality.

Although we have clarified the pleading requirements for shareholder derivative suits, the district court's inquiry into this issue may not end at the pleading stage. If the district court should find the pleadings provide sufficient particularized facts to show demand futility, it must later conduct an evidentiary hearing to determine, as a matter of law, whether the demand requirement nevertheless deprives the shareholder of his or her standing to sue.

As the parties and the district court have not had the opportunity to address the demand requirement in light of this opinion, we reverse the district court's dismissal order and remand this matter for further proceedings regarding demand futility. Appellants should be afforded leave to newly amend and file their complaint(s), given our adoption of the *Aronson* and *Rales* tests for reviewing demand futility assertions.

ROSE, C. J., BECKER, MAUPIN, GIBBONS, DOUGLAS and PARRAGUIRRE, JJ., concur.